UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| | ) | |
| | ) | |
| v. | ) | Criminal No. 05-CR-10088-EFH |
| | ) | |
| | ) | |
| RUDOLPH J. LIEDTKE | ) | |
| RJL SCIENCES, INC., d/b/a | ) | |
| RJL SYSTEMS, INC. and | ) | |
| | ) | |
| | ) | |

## AGREED STATEMENT OF FACTS

The United States and Defendants RJL Sciences, Inc., d/b/a RJL Systems, Inc., and Rudolph J. Liedtke hereby stipulate and agree to the following facts in support of the Defendants' pleas of guilty to the Information filed March 30, 2005:

1.    The Defendant RJL Sciences, Inc., d/b/a RJL Systems, Inc. (hereinafter referred to as RJL) was located in Clinton Township, Michigan. RJL manufactured and sold medical devices, including bioelectrical impedance analysis (known as "BIA") devices and computer software for use in connection with the BIA devices. Commencing in 1996, RJL manufactured and sold BIA devices and computer software together with, and pursuant to agreements with, others.

2.    The Defendant Rudolph J. Liedtke (hereinafter referred to as Liedtke) was the President and principal owner of RJL. Liedtke directed, participated in, and controlled the manufacture and sale of the BIA devices and computer software devices RJL

manufactured and sold together with, and pursuant to agreements with, others.

3.     The BIA device manufactured and sold by Defendants consisted of a portable device with two protruding electrodes to be attached to the hand and foot of human test subjects. The BIA measured the rate at which low levels of electrical current pass through the body. The BIA device measured the degree to which the electrical current encountered "impedance" while passing through the body and measured "resistance" and "reactance." The resistance and reactance measurements obtained by performing a BIA test on a human subject reflected the degree to which the subject's body resisted the flow of the current and the extent to which the current was flowed through the body.

4.     The resistance and reactance measurements generated by the BIA device were used to estimate the body composition of individual humans. Estimates of body composition were computed by applying the resistance and reactance measurements generated by the BIA device to prediction equations. Such prediction equations were developed by mathematically calculating the statistical relationship between the resistance and reactance measurements obtained by performing BIA tests on a sample population of human subjects and actual measurements of body composition for that population. Prediction equations used to estimate body composition of humans varied depending on the characteristics and size of the sample population used to develop the equation and on the methodology used to measure the body composition within that population.

5.     The Defendants participated in the development and distribution of various BIA software devices, including computer software known as Body Comp, Weight Manager, Fluid & Nutrition, Cyprus, and computer software that will be referred to as "Y software" for use

in estimating body composition in humans.

6.    The BIA and computer software devices were each medical devices within the meaning
      of the Federal Food, Drug, and Cosmetic Act ("FDCA"), 21 U.S.C. § 321(h).

7.    RJL and Liedtke could not legally sell BIA and computer software devices without first
      obtaining premarket clearance and/or premarket approval from the U.S. Food & Drug
      Administration ("FDA"), depending on the intended use of the devices.  FDA could grant
      what is called a 510(k) premarket clearance if it determined, following review of the data
      submitted in support of the applicant's premarket notification, that a device was
      substantially equivalent to a device (known as a "predicate device") that was marketed in
      interstate commerce prior to May 28, 1976, the enactment date of the Medical Device
      Amendments to the FDCA.  A device could only be found substantially equivalent to a
      predicate device if, among other things, the intended use of the current device was the
      same as the intended use of a predicate device.  If the intended use of the device was
      different from the intended use of a predicate device, substantial equivalence could not be
      found.  Under such circumstances, the manufacturer could not legally market the device
      in interstate commerce unless the FDA had first reviewed and approved a premarket
      application to market the device.  Premarket approval review by the FDA generally
      entailed, among other things, a review of clinical trials and scientific data offered to
      confirm the safety and efficacy of the device as well as a review of the device's labeling,
      which must include adequate directions for use.

8.    In 1983, Defendants RJL and Liedtke filed a 510(k) premarket notification with FDA's
      Center for Devices and Radiological Health ("CDRH") seeking premarket clearance for a

-3-

Body Composition Analyzer, a type of BIA device manufactured and sold by RJL. In that 510(k) submission, Defendants stated that the intended use of the BIA device was to estimate total body water, lean body mass (also known as fat free mass), and fat in healthy humans. RJL's BIA device was accompanied by a hand-held programmable calculator or computer to facilitate the computation of estimated total body water, lean body mass, and fat. After a review of the data submitted in support of the 510(k) submission, FDA found that the Body Comp Analyzer was substantially equivalent to a device that had been marketed prior to the FDCA medical device amendments of 1976 and granted premarket clearance to RJL to distribute the device on August 11, 1983, for the intended uses of estimating total body water, lean body mass, and fat in healthy humans.

9.    During a subsequent inspection of RJL by FDA in October 1984, FDA discovered that RJL had been marketing a modified version of the BIA device as well as computer software devices that had not been previously reviewed by FDA as part of a 510(k) submission. FDA issued a Notice of Adverse Findings to Defendants RJL and Liedtke in January 1986, informing them that the October 1984 inspection revealed that they had been marketing misbranded devices - specifically, the modified BIA device and the accompanying computer software device - in violation of the FDCA.

10.    In response to FDA's Notice of Adverse Findings, Defendants submitted another 510(k) premarket notification for the modified BIA device as well as for the new computer software device accompanying the BIA device on June 24, 1986. RJL and Liedtke told FDA's CDRH that the computer software only performed calculations that previously

-4-

would have been done by hand to estimate body composition and that the Body Comp

Analyzer and accompanying computer software had the same intended uses as the

previously submitted BIA device for estimating total body water, lean body mass, and fat.

Defendants told CDRH that the intended uses of the BIA device and accompanying

computer software did not include measuring body cell mass or diagnosing any disease

state. Defendants also described the methods used to develop the prediction equations in

the computer software and told CDRH that the equations were based on a population

consisting of 278 healthy and obese college students whose body composition was

measured through hydrostatic weighing and that total body water measurements of the

college students were determined using deuterium oxide dilution.

11.    Based on the representations made by Defendants RJL and Liedtke in their 510(k)

submission and related communications, FDA's CDRH concluded that the modified Body

Comp Analyzer and accompanying computer software were substantially equivalent to a

device marketed prior to the medical device amendments of 1976 and granted premarket

clearance to RJL to distribute the Body Comp Analyzer and the accompanying computer

software devices on February 3, 1987, for the intended uses of estimating total body

water, lean body mass, and fat in healthy humans. At that time, the computer software

device was called Body Comp. Later versions of RJL software with similar intended uses

were called Weight Manager.

12.    Commencing in at least 1994, Defendants RJL and Liedtke assisted others in developing

a prediction equation that would calculate the BIA resistance and reactance readings into

estimates of body cell mass. This equation (herein the "Z equation") estimated body cell

mass based upon measurements of total body potassium in a population referred to herein as the "ABC database" that consisted of approximately 332 humans, including individuals who were healthy and others who had been tested as HIV-positive.

13.    Commencing sometime during 1994, Defendants RJL and Liedtke developed new computer software for use in interpreting BIA test results that incorporated the Z equation and marketed the software under the name "Fluid and Nutrition Analysis," or "FNA." The FNA software purported to calculate the individual test subject's estimated body cell mass, total body water, intracellular and extracellular water, fat free mass, extracellular tissue, and fat. The FNA software also computed purported "normal" ranges for the individual test subject's total body water and intracellular and extracellular water. These "normal" ranges were calculated by Defendants RJL and Liedtke by comparing the individual's BIA test results to a select portion of the population included in the ABC database. This FNA software, pursuant to 21 U.S.C. § 351(f)(1)(B)(i), required FDA approval before it could be legally marketed. No application for premarket approval has been submitted to the FDA with respect to the FNA software, and the device has never been the subject of an approved application for premarket approval under 21 U.S.C. § 360e.

14.    Others marketed and sold a drug known to the United States Attorney, referred to herein as "the drug," which was approved by the FDA to treat AIDS wasting, a condition involving profound involuntary weight loss in AIDS patients. At the time the FDA approved the drug, AIDS wasting was an AIDS defining condition.

15.    In or about January, 1995, Defendants met with others regarding possible uses of BIA

-6-

technology by others known and unknown to the United States Attorney. Thereafter,
between September, 1995, and June, 1996, Defendant RJL shipped approximately 25 BIA
devices together with FNA Version 3.1 software packages to others known and unknown
to the United States Attorney for use in evaluating body composition in AIDS patients.

16.    Commencing as early as September, 1996, and continuing thereafter until about January,
2002, the Defendants and others knowingly and willfully combined, conspired, and
agreed, to commit an offense against the United States. The parties to this conspiracy
agreed to introduce or deliver for introduction, or to cause to be introduced or delivered
for introduction into interstate commerce, and did in fact introduce and cause to be
introduced and delivered for introduction into interstate commerce, with intent to defraud
and to mislead, adulterated medical devices. Specifically, these adulterated devices were
BIA computer software packages known as FNA, "Y software," and Cyprus for others use
in calculating body cell mass and/or diagnosing AIDS wasting based upon BIA resistance
and reactance measurements. These devices were adulterated within the meaning of Title
21, United States Code, Section 351(f)(1)(B)(i), in that neither RJL, Liedtke, nor others
had obtained premarket approval from the FDA to introduce such medical devices into
interstate commerce, in violation of 18 U.S.C. § 371, 21 U.S.C. §§ 331(a) and 333(a)(2).

17.    It was the purpose of this conspiracy that RJL and Liedtke and others introduce or deliver
for introduction, or cause to be introduced or delivered for introduction into interstate
commerce, adulterated devices to increase the market for BIA devices and computer
software and to increase the market for the drug. To that end, RJL and Liedtke and others
participated in the development and dissemination of BIA computer software that

-7-

purported to measure body cell mass for use in diagnosing AIDS wasting based upon a test subject's purported loss of body cell mass. The disease state of AIDS wasting, for which the drug was tested and approved by FDA, consisted of profound involuntary weight loss and loss of lean body mass in AIDS patients, and did not include loss of body cell mass. Use of BIA computer software that purported to measure loss of body cell mass enabled RJL, Liedtke and others to expand the market for the BIA devices and computer software devices and for others to expand the market for the drug beyond the disease state for which the drug was tested and approved.

18.    This conspiracy operated through various manner and means. It was part of the conspiracy to disseminate BIA devices and FNA software to others in order to promote the diagnosis of AIDS wasting as a disease state involving the loss of body cell mass and to thereby promote the prescribing and sale of the drug. The FNA software was not submitted to the FDA for premarket approval and was not approved by the FDA for shipment in interstate commerce for the intended use of measuring body cell mass or diagnosing AIDS wasting. The inclusion of the Z equation and the ABC database in the FNA software, and the use of the computer software to measure body cell mass and as a tool for diagnosing AIDS wasting, as alleged herein, were new intended uses that required premarket approval from FDA before their introduction or delivery for introduction into interstate commerce.

19.    It was also part of the conspiracy to develop and disseminate the "Y software" to others in order to promote the diagnosis of AIDS wasting as a disease state involving the loss of body cell mass and to compute purported "ideal" levels of body cell mass and other body

composition parameters for individual BIA test subjects in order to promote the prescribing and sale of the drug. The "Y software" was not submitted to FDA for premarket approval and was not approved by FDA for shipment in interstate commerce for the intended use of measuring body cell mass or diagnosing AIDS wasting. The inclusion of the Z equation, employing the National Health and Nutrition Examination Survey, or "NHANES," database as the population base for computing "ideal" body composition values in the "Y software," and the use of the computer software to measure body cell mass and as a tool for diagnosing AIDS wasting, as alleged herein, were new intended uses, and required premarket approval from FDA before introduction or delivery for introduction into interstate commerce.

20.    It was part of the conspiracy to develop and disseminate the Cyprus software to others known and unknown to the United States Attorney in order to promote the diagnosis of AIDS wasting as a disease state involving the loss of body cell mass and to compute purported "normal" levels of body cell mass and other body composition parameters in order to assist others to promote the prescribing and sale of the drug. The Cyprus software was not submitted to FDA for premarket approval and was not approved by FDA for shipment in interstate commerce for the intended use of measuring body cell mass or diagnosing AIDS wasting. The inclusion of the Z equation, employing the NHANES database as the population base for computing "normal" body composition values in the software, and the use of the computer software to measure body cell mass and as a tool for diagnosing AIDS wasting, as alleged herein, were new intended uses, and required premarket approval from FDA before introduction or delivery for

introduction into interstate commerce.

21.    The parties to the conspiracy engaged in various acts in furtherance of the conspiracy. In
or about September, 1996, RJL and Liedtke met with others in Clinton Township,
Michigan, regarding possible uses of the BIA and FNA software devices by others in
marketing the drug.

22.    In or about October, 1996, Defendant Liedtke traveled together with employees of
Defendant RJL from Michigan to Massachusetts to meet with others regarding the sale
and delivery of BIA and FNA software devices.

23.    In or about December, 1996, Defendants RJL and Liedtke manufactured and shipped
from Michigan to Massachusetts to others approximately 50 BIA devices accompanied by
approximately 50 FNA software devices that included the Z equation. Defendants RJL
and Liedtke affixed plates to the outside of the BIA devices bearing the name of others
pursuant to their direction and specifications.

24.    Commencing in or about February, 1997, others provided the BIA devices and FNA
software received from Defendants RJL and Liedtke to others for use in measuring body
cell mass, diagnosing AIDS wasting in humans who were potential candidates for
receiving the drug, and promoting sales of the drug.

25.    Commencing in or about March, 1997, employees of Defendant RJL traveled from
Michigan to Massachusetts and elsewhere to train others in performing BIA tests on
humans.

26.    Commencing in or about June, 1997, employees of Defendant RJL forwarded to others
training materials for use in training others in performing BIA tests on humans. These

training materials included a training video for use in training others in performing BIA
tests on humans.

27.     Commencing in or about June, 1997, employees of Defendant RJL forwarded to others a
        "Body Composition Analysis Worksheet" for use in interpreting BIA tests and obtaining
        reimbursement for the drug.

28.     In or about August, 1997, Defendants RJL and Liedtke and others executed a written
        agreement governing the sale by Defendants RJL and Liedtke of BIA and computer
        software devices to others.  Pursuant to this agreement, Defendants RJL and Liedtke, and
        others agreed, among other things, that RJL would provide "a specialized, private labeled
        model for [others]" that included, among other things, "R.J.L.'s Fluid & Nutrition
        Analysis Clinical Software Program for medical reimbursement," and further agreed to
        cooperate "for the development of new software and/or hardware for the diagnosis and
        monitoring of AIDS Associated Wasting and monitoring treatment with [the drug]."

29.     Commencing in or about August, 1999, Defendants RJL and Liedtke and others
        collaborated in the creation of a BIA computer software package referred to herein as "Y
        software," which included the Z equation for estimating body cell mass; calculated
        purported measurements of body cell mass, fat, extracellular mass, fat free mass,
        intracellular and extracellular water, and total body water calculations; and computed the
        individual test subject's measurements purported "ideal" amounts for each of these values.
        The Defendants knew and understood that the  "Y software" computed these "ideal"
        values by comparing the individual subject's BIA test results to a select portion of a
        database of humans derived from the NHANES survey, and that the "Y software"

-11-

provided these "ideal" values as precise numerical amounts, rather than as ranges for these values. In crafting the "Y software," Defendants had eliminated any standard deviation from the software pursuant to express directions from others for the purpose of identifying purported candidates for receiving the drug, and promoting sales of the drug.

30.    Commencing in or about August, 1999, RJL transmitted various versions of the "Y software" to others.

31.    Commencing in or about September, 1999, others disseminated the "Y software" to others for use in measuring body cell mass and diagnosing AIDS wasting in humans who were potential candidates for receiving the drug, and promoting sales of the drug.

32.    Commencing in or about September, 1999, employees of RJL and others prepared and disseminated training materials regarding the "Y software," provided training to others in the use of the software, and established a "Hotline" that others known and unknown to the United States Attorney could telephone to obtain guidance in using the "Y software."

33.    Commencing in or about September, 1999, Defendant RJL, at the direction of others, prepared and posted a website which provided information and training regarding the use of the "Y software."

34.    Commencing in or about February, 2000, Defendants RJL and Liedtke and others evaluated the possible use of versions of RJL computer software known as Cyprus. Pursuant to directions from others, Defendants RJL and Liedtke created for the use of others a version of the Cyprus software known as Cyprus 1.2 Condensed. This computer software package included the Z equation and purported to calculate body cell mass, fat, extracellular mass, fat free mass, total body water, intracellular water, and extracellular

water. The Cyprus 1.2 Condensed software also computed purported precise "normal" amounts and "normal" ranges for these values for each individual by comparing the individual test subject's results to a select portion of a database of humans derived from the NHANES survey, and included a standard deviation for these calculations.

35.    In or about September, 2000, others determined to withdraw the "Y software" from use by others. In place of the "Y software," others disseminated the Cyprus 1.2 Condensed software for use in measuring body cell mass and diagnosing AIDS wasting in humans who were potential candidates for receiving the drug, and promoting sales of the drug.

36.    Commencing in or about September, 2000, and continuing until at least January 2002, others disseminated the Cyprus software to others for use in measuring body cell mass and diagnosing AIDS wasting in humans who were potential candidates for receiving the drug, and promoting sales of the drug.

**STIPULATED AND AGREED TO BY:**

**FOR THE DEFENDANTS:**

RUDOLPH J. LIEDTKE, Defendant
Individually, and on behalf of
Defendant RJL Sciences, Inc., d/b/a
RJL Systems, Inc.

and

**FOR THE UNITED STATES:**

MICHAEL J. SULLIVAN
United States Attorney

By: _____

MARY ELIZABETH CARMODY
Assistant United States Attorney
John Joseph Moakley Federal Courthouse
One Courthouse Way, Suite 9200
Boston, MA 02110
(617) 748-3290

-13-

Counsel for Defendants Rudolph J. Liedtke
and RJL Sciences, Inc., d/b/a
RJL Systems, Inc.)

ROBERT M. KALEC, ESQ.
Dean & Fulkerson
801 West Big Beaver Road, 5th Floor
Troy, MI 48084
(248) 362-1300

and

Scott P. Lopez
Law Office of Scott P. Lopez
24 School Street, 8th Floor
Boston, MA 02108
BBO # 549556
(617) 742-5700

SONDRA L. MILLS
Trial Attorney
United States Department of Justice
Office of Consumer Litigation
P.O. Box 386
Washington, D.C.  20044
(202) 616-2375